Judges of the United States Court of Appeals for the Second Circuit Please be seated. I said it would be a brief recess. I've been advised by the Clerk of Court that the Council and all the remaining cases are present and ready to argue, so I will dispense with reading the calendar. We have three cases to be argued. The first is Huebner v. Midland Credit Management, and we're ready to begin with that case. Lawrence Katz, appearing for Levy-Huebner. In reviewing this case, it's clear that when the judge finally made his decision regarding sanctions, that the judge had come to the conclusion, as he put it, that this case had made a mountain out of a molehill. It is certainly the one part of the judge's decision that appellant would agree with. The question, to some extent . . . Who had made a mountain out of a molehill? Well, that the case was a mountain out of a molehill. And essentially, the case has gotten so large, despite the fact that the issues were really not that . . . Where's the molehill? I assume the . . . I see the molehill. I see the mountain, but I don't see the molehill. The molehill is, in an FDCPA case, generally speaking, the facts are rather concise. In this case, for example, the facts truly surrounded one phone call, which lasted perhaps a couple of minutes. That is the entire case. There's not days and days of testimony with all kinds of evidentiary rules and issues that might follow from that. It's a simple conversation. What's the point? The point is that, in fact, the way that this case proceeded created many of the issues that the judge complained about himself. By way of example, the first thing that this judge did in the case was to complain about the complaint sui sponte. It wasn't because the complaint was somehow, under Article III, lacking in jurisdiction. It was that the complaint included too much law. That was the judge's complaint initially with plaintiff's case. In fact, what we have here . . . I thought the judge was particularly concerned about lies, about the plaintiff lying. The initial action by the judge was that the plaintiff was required to amend his complaint, not because of a lie. In terms of what Your Honor is referring to, the judge was concerned that a statement had been made in which the judge believed the court had been misled by counsel. This was the statement that the recording at issue would show that Elliot had told your client that he had to dispute his debt in writing when that, in fact, was not the case? Yes. The only problem, though . . . The initial problem with that is I'm not sure where one would find that in the record. There does not seem to be any record of that having happened. So that's the first problem. No record of what having happened. In other words, I don't believe that that was a . . . The judge was complaining about something that had happened at a conference that was not recorded. There was no transcription of that conference.  In addition, if you look at the case that was brought, which was brought basically because Midland Funding did not permit the plaintiff to simply dispute his debt orally, that argument that, in fact, Midland Funding would not permit any consumer to dispute the debt orally was something that was brought up by the Consumer Protection Bureau itself against Midland Funding. And so even if it were true, which, again, there is no record that it was true, it's certainly possible for counsel to have gone in that day on an FDCPA case, which was based upon his client's conversation about an oral dispute and misstated that without it being a lie. I'm sorry, Judge. Did the complaint not allege that there was a violation because the plaintiff was told that he couldn't dispute orally? I think . . . That was the theory, right? I think that that is found later in the complaint as one of the legal theories rather than saying factually that that happened. And Judge Kogan recalled that counsel said that at the conference as well. And then the tapes show that that was not true. Well, the tape certainly shows what is true as to whether or not Midland Funding . . . The tape does not support the assertion that the agent said you cannot dispute this orally. I would say that the tape certainly does not indicate that the Midland Funding representative told the plaintiff that he could not dispute the debt orally. But it may very well be that one could . . . And so counsel represented that it did. It turned out that it did not. Well, again, I think Your Honor . . . I understand the trial judge's frustration. I think . . . It might very well be that what? You started a sentence saying it might very well be, although the tape didn't show such a statement, it might very well be that what? What were you going to say? It might very well be that Midland Funding would not have accepted an oral dispute. In other words, if it was in Midland's policy not to accept an oral dispute, regardless of the conversation, Midland Funding would not accept an oral dispute. Didn't the complaint say that he was told by Midland that he needed to put it in writing? No. I don't believe that the complaint actually specifically said that. The complaint complained that, in fact, he was not given his right to dispute it orally. And if you look at the factual record here, it, in fact, indicates that when Levy-Eubner called and said that he wanted to dispute the debt, what happened was that the representative said, if you want to dispute the debt, you need to hold for the next representative. In other words, if you don't hold for the next . . . . . . furnished by the plaintiff, invited, the Midland invited the plaintiff to dispute it orally. They said to him, what is your dispute? Tell us what your dispute is. No. I would disagree with that, Judge. What happened here doesn't start with that part of the conversation. It starts with the . . . Doesn't it contain what I just said? Well, it contains what you said, but Your Honor is concluding by that, that they invited him to make a dispute. And I would say . . . What is your dispute? Yes. That is true. There was a conversation in which they questioned Mr. Eubner as to what his dispute was based upon. That is correct. Which, under the law, Mr. Eubner was not required to give them an explanation in order to make a dispute. So, if you start with . . . Judge, I'm looking at paragraph 21 of the complaint, which is at page 41. It says, upon information and belief, Midland Credit Management, Inc., and its employee wrongfully stated to the plaintiff that he could not orally dispute the debt with Midland Credit Management, Inc. So that's squarely asserted in the complaint. Well, I would say that it says, upon information and belief, it's found later on in the complaint. And while I think Your Honor is giving it a very exact reading, I don't think . . . I might not be giving it an exact reading. It's the plaintiff's complaint. Yes, Judge, but if you read the complaint in a whole, the initial allegations are about the conversation regarding the dispute, which, again, starts off with a conversation in which the minute Mr. Eubner mentions that he wishes to dispute, he is placed on hold. And then, after waiting quite a time, he then gets to the next representative at the so-called dispute department. And the first thing that that . . . Is there something wrong with transferring him to the dispute department? I would say yes and no. I think it can be done correctly. If somebody says, I dispute the debt, and you answer, we have noted your dispute, we would like you to hold to speak to the dispute department to see whether we can resolve your dispute, that would be fine. But if someone has a right to dispute without giving any other explanations and says, I dispute the debt, and you tell them to stay on hold, you are . . . And I believe that with a standard, certainly least sophisticated consumer, certainly could believe that he is required to remain on hold in order to dispute the debt. What is your argument as to what a debt collector should do with a person who has an unpaid debt, and he calls up and he says, I want to dispute this debt, and is asked, well, what is your dispute? And he says, I don't have to give you a reason. I just dispute it. What should they do with a dispute? What do you think the law means as to what they should do with a dispute as to which the disputer refuses to explain what is his dispute? So the first thing that should be done is to acknowledge the dispute and indicate that, in fact, the dispute is being recorded on his file. After doing that, when somebody says they do not wish to give an explanation, it seems to me that at some point it's simply harassment to continue asking the question. But, again, in our case, we don't have that example. We have somebody being placed on hold without any acknowledgement that his dispute is required to be recorded, and then when the person gets on, the first questions that are asked are confirming his address, which, again, under the FDCPA, as we know . . . Go on. According to what we have in the record, what was done following the phone call is essentially they closed the file and . . . Stopped, ceased to attempt to collect it. That's correct, but if you read the whole history of this case, you'll see that this is not the first collection agency to attempt to collect this debt. And this Court and other courts have basically ruled that debt collectors can sell their debts one to another, and with each new debt collector, one again has to deal with exercising their rights, whether it's written disputes or orally disputes, over and over again. So, the notion that there shouldn't be a dispute recorded when the courts have basically all said that it's okay for this collection account to go from one collector to another, it seems to me is somewhat contradictory. In order to protect your rights, disputes need to be recorded. And had, in fact, the prior collection agencies properly disputed the debt, then the debt would have already been indicated as being disputed for Mr. Eubner, and it should have been that way, but it wasn't. Thank you. Good morning. May it please the Court, Andrew Schwartz from Marshall Denny, on behalf of the Respondent, Midland Credit Management and Midland Funding. Just to clarify a point that was raised in Appellant's arguments, they talk about the phone conversation, the October 17, 2013 phone conversation. They talk about being placed on hold. But point, in fact, from the transcript, Mr. Eubner, Appellant Eubner, did not dispute the debt when he initially spoke with an account manager, Mr. Gables. What he said was, if I wanted to dispute this, and I'll quote the language in the transcript, and I want to know, if I want to dispute the debt, what would I have to do? At that point, the account manager, who has the ability to mark an account as disputed, said he's looking for additional information on how to go about disputing a case. So he directed Appellant Eubner to a Miss Elliott in the customer service specialist who specializes in disputes. At all times during the call, based on the transcript, they acknowledged the dispute. And what they did at the end of that conversation was they put in a code, a Code 289. And we know from the record what that does. One, it marks the account as disputed on our credit files. It sends a signal to the credit bureaus to delete the trade line. So it no longer exists on a credit report. That went through the process that very day. Additionally, on that day, there was a letter sent to Appellant Eubner, correctly addressed, not returned as undeliverable, telling him exactly what Midland Credit Management did. They requested the deletion of the trade line, to cancel the debt, deletion of the trade line to TransUnion, Equifax, and Experian. There is nothing in the record that shows that the trade line appeared on his credit reports thereafter. So just to clarify that, he didn't dispute, but even if he did dispute at the outset, even if he did dispute with the account manager, and the account manager transferred him to a specialist who deals with these disputes, there is no violation there. It's a continuation of a phone call. They didn't attempt to dissuade him. Despite the evasive conversation, Appellant Eubner's attempt to set up my client for an empty CPA violation, he failed. But while the telephonic initial conference, during the course of the telephonic initial conference, there is no record. But what we do know is, obviously from the complaint, the second version of the complaint, the first version was sua sponte, dismissed because it didn't comply with short and plain statements. It read as a brief. When they corrected that problem, there was also a joint plan that was submitted to the court, where they repeated the fact that Midland refused to accept a verbal dispute. They demanded it in writing. So what submitted? The joint discovery plan that was submitted to the court in advance of the initial conference. So you have a record there. But the judge's understanding of that conversation was correct. They kept this theory through from their second complaint through the initial conference. They made blatant misrepresentations. Appellant Poulterak made blatant misrepresentations during the initial conference. He approached it in bad faith and was properly subject to sanctions for violating Rule 16 under Rule 11. The penalty for that is appropriate. It tells attorneys, don't come to court and don't act in bad faith. There's a consequence for your actions. I don't think this reflects a bias by the court. This was simply the district judge trying to tell a plaintiff's attorney as well as a plaintiff to do the job the right way. If they have a valid claim, put it in a complaint. And if it turns out it doesn't pan out, if they have other complaints, they can always amend it. But don't come to court and misrepresent on information and belief. They had a recording. I don't understand how you have a record, a recording in your possession, and you say on information and belief this is what happened. Plainly it was the opposite, and Judge Kogan correctly determined that they misrepresented themselves at the initial conference. I think, though, stepping back quickly, the overarching argument here is appellant's position that a debt collector in honoring a dispute cannot ask questions concerning the nature of the dispute. Now, the FDC case certainly doesn't support that argument. And there's no case law that supports that argument. There are cases out there, like the DeSantis decision by this court, that says you can't condition a dispute, processing a dispute, based on a valid reason. You can provide a valid reason. You can provide a bad reason. You can provide no reason at all. And Midland's procedures are very clear on that. They accept verbal disputes. Whether you provide a reason, whether you don't provide a reason, they mark it as disputed. Here, what Mr. Huebner said in his conversation with the customer service specialist, Emma Elliott, he said two things. He said, how can I get this off my credit report? How do I dispute this? She acknowledged a dispute. She explained to appellant Huebner, you can't just remove something off a credit report because a consumer calls up and says, hey, can you remove it off my credit report? But by the end of the conversation, she made the decision. She coded it 289. It's what happened. Not only did Midland Why? Why? There are a number of reasons. One is probably the value of the debt itself. It was $131 debt. You have the individual complaining, acting evasively. There is a certain sensitivity to, for debt collectors, particularly the specialists on those quote unquote setup calls. They're fairly prolific. There are a lot of calls to debt collectors where people are trying to set up FDCPA claims. And obviously this evokes some suspicion. So it wasn't worth pursuing it. So the process is, so that's what happened here. Midland turns around, and the automated process not only requests deletion from the credit bureaus at that point, it has to go through the process about six days later. But then to ensure that the deletion request goes through to the credit bureaus, they generally cycle it through three additional times. So four times, four times they requested that TransUnion, Experian, and Equifax delete the trade line. The briefing seems to suggest there's a difference between requesting deletion of the credit agency and informing the credit agency that the debt is disputed. Is that correct? That's correct. If you report that it's disputed, you put in a dispute code. There's a 050 is the code that Midland puts into their system. And it shows that it's disputed. And that's fine. And that's what happens. You get a verbal dispute. They code it 050. It goes in, and it's marked as disputed on the trade line. And it goes on from there. And collections continue. Here, the customer service specialist decided to take the step further. And unfortunately, they end up getting sued for their good deeds. But that's what happened here. The argument that you somehow. The deletion goes further than the dispute. The dispute becomes moot if the debt is simply deleted. The person who owned the right to collect it said, I'm not collecting it. I'm simply abandoning it. Absolutely. Absolutely. That's exactly what happens. And so that is exactly what happens there. So they went over, above, and beyond. There's no longer a debt. Right. And, of course, the bigger issue is a verbal dispute. Somebody says I verbally dispute this. You don't have to cease collections. You can continue collections. What you can't do. The idea is you're supposed to, if there's a dispute, you cease collection pending verification. Well, that's an interesting issue because I disagree with that. I think that when you have a verb, the way the FDCPA reads, 1692Ga, it talks about two aspects. One is a dispute, and it doesn't say in writing. You can verbally dispute. It's clear from the statute. But if you want validation, if you want us to stop collection, if you want us to go and validate your debt, the FDCPA's plain language says it has to be in writing. And I understand that the Second Circuit has addressed this issue in the past, as well as my circuit, the Third Circuit has done in Graziano, and this one was, I believe, Hooks v. Foreman. I believe that the courts viewed it as there was an inherent conflict between a verbal dispute and in writing. And in the Third Circuit, they said everything's got to be in writing. A dispute's got to be in writing. And this circuit says you can verbally dispute. But I think that that kind of misses the point. I think you can verbally dispute, and you have to mark it as disputed. That is all moot in connection with this case. Correct. Correct. Upon the receipt of a verbal dispute with no reason given to support the dispute, the owner of the debt simply canceled the debt and said you no longer owe the money and advised the credit agencies, advised the credit reporting agencies that there's no debt. That's correct in Appellate Huebner's position. That may not be correct in every verbal dispute. If there's a verbal dispute, they mark it as disputed, and they continue collections. I'm talking about this case. Absolutely. Absolutely. That is what happened here. So that's the issue there. Just moving on quickly to the other sanctions. Appellate Polteract, Appellant Huebner, showed a general disregard of the scheduling order of the procedures. The second level of sanctions was because they failed to follow the protective order. The procedures that we agreed to, a stipulated protective order, both sides agreed to use a mechanism to resolve whether something should be marked confidential, whether it should be lifted, how you quote confidential. Despite that, they had complete disregard of those particular terms. They filed a 22-page letter motion to the court. The court rejected it. We did a joint letter. We explained why they weren't following the process in the letter. They went for it anyway, and the judge, once again, hit them with sanctions entirely appropriately. And finally, the big sanctions. This case was brought in bad faith, and it was brought for the purposes of harassing my client into settlement. It was brought on a lie. That's not me saying it. That's the judge saying it. It was brought on a lie. It was maintained after that lie kind of got, they put window dressing on the lie, and they proceeded forward with a new theory, a new theory that was equally flawed at the get-go. It's not supported by the FDCP. It's not supported by case law. We placed them repeatedly on notice. We have e-mail as part of the record saying we're going to go for our sanctions if you don't walk. We're entitled to our sanctions under Section 1692K and under 28 U.S.C. 1927. They didn't pay it any regard. They proceeded. My client incurred a lot of expense in defending the case. At the end of the day, we were proven right. Their case was baseless. It had no basis in law. And the court then decided to award the sanctions. Now, we didn't get what we expected. You're saying that the motivation, you're saying that the plaintiff's motivation in pursuing the case was to get a settlement in order to be able to collect legal fees? That's the case. That's the situation. And, of course, they vexatiously magnified and brought a case that they should have known from the get-go was baseless. Even under their second claim, they should have been aware of their claim that asking a question in the context of dispute management is a violation of the FDCPA. There's no case law that supports that. It's counterintuitive. The purpose of a dispute, one of the purposes of a dispute is to resolve the dispute. You can't resolve a dispute without asking questions. And if you marked it as disputed, which we did, we honored the dispute, you can ask us. Questions and questions. Absolutely. A question like, would you like to have your knees broken? Will you tell us what is the nature of your dispute? Well, that would lead probably to a 1692D harassment claim, but hopefully they don't ask questions. But questions, how did you incur this debt? Did you pay a prior, a nonexistent debt? What does that mean? Those are questions that we're trained to ask in order to resolve the debt if possible. Just very quickly, the typical situation is somebody, we send a letter out, you owe $1,000 on a Citibank debt. Somebody calls up and says, I dispute this debt because I don't owe $1,000. Well, what do you owe, $600? It turns out that's the principle. When you add the late fees and interest costs and all that, it comes up to $1,000. So the person says, I only owe $700. And we go, okay. Pay the $700. The dispute is resolved. The debt is settled. They pay their bills like they're supposed to. And that's the end of the story. That's the reason why you are, that's one reason why a dispute is important. The other reason, obviously, is so that we can't, we have to mark off, but we can't assume the debt is valid. So we can't bring an account stating the case. We can only bring a breach of contract lawsuit if it goes that far. And we have to notify the credit bureaus. And that happened here. So, in fact, we went further. We deleted it. So, in any event, we were disappointed, frankly, at the judge's decision on sanctions, because they certainly vexatiously litigated the case. And they maintained it in bad faith and for the purposes of harassing my client. But we're satisfied. We didn't appeal it. And I think that's all. Thank you. Are you seeking sanctions in connection with this appeal? We reserve the right under Rule 38. We believe this is a continuation of the vexatious litigation. But I think it's unlikely. The assumption that because the debt is now removed, that it could not appear again on a credit report, I believe, is incorrect. We see that all the time with identity theft. And this case also demonstrates it by the fact that this has gone from one collection agency to another. And so, because you've removed a derogatory report from a credit report does not mean that you can't also indicate that it's disputed. Certainly, we have the technology available to do such a thing. It's not something that somehow would be considered so absurd. You'd rather have it reported as a continuing but disputed debt than as no debt at all? No, Your Honor is correct that in terms of what happened benefits the plaintiff in terms of removal. And, of course, the plaintiff is not complaining about its removal. However, it would also benefit the plaintiff and would be in accordance with law if it was marked disputed. Because if it came up again, it would have that mark. That's not an absurd thing to say. And I understand that if you look at the case, you might say, well, what really happened to Levi Eubner, who's a lawyer? But the fact is that the standard in this case is the least sophisticated consumer. What happens to a consumer when he calls up in the funding and says, I'd like to dispute the debt? It seems to me that the record does support that. Wouldn't he be thrilled if the debt were deleted right then and there, as happened here? Again, I think Your Honor is correct. Getting something off a credit report is very advantageous to the consumer. But it should also be indicated that, in fact, the debt is disputed. And both those things can be done. This is not simply erasing something that's written in pencil and removed. That's not how things work today. If this thing exists, it exists in a sense forever and can certainly come back, despite the fact that it's been removed from a report. And that's happened on many cases. So it's not a far-fetched or crazy idea that someone would want it to be disputed, which is what the statute says, by the way. In fact, the statute, I guess I could argue, could have said that if you remove it from the credit line, you need not mark it as disputed. I don't see that in the statute. But, again, it could also be common sense, I guess. Isn't it common sense? Well, it's common sense, but it doesn't really fit into the reality of today. The reality is that reports come back and back and back. And while counsel for the respondent is busy arguing how his collection agency just collects debts in a fair way for people who really owe the money and simply refuse to pay, that's not necessarily what these cases demonstrate about debt collectors. And that's not what the Consumer Financial Bureau is busy with, with debt collectors who are honest and fair and reasonable and, frankly, don't need any regulation whatsoever. It's not reality. The reality is that when you call Midland Funding, they have a system, and the system is designed to get information out of you. And that's precisely what happened here, because when that call was elevated, even Lavey Eubner, who is a sophisticated debtor, even he gave his address to that person. And I, as a lawyer, and any lawyer would have said, don't give them that information. In fact, that's what the FDCPA says. Miranda, Minnie Miranda, Minnie Miranda, don't give them information. It's against your interests. Here's a warning. Here's another warning. Write a letter. And— Mr. Katz? Yes. The red light is on. We have your argument. Thank you. Thank you both. I will take the matter under submission.